UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

    Plaintiff

v.                                                                  CASE NO.: 6:25-cr-5-JSS-DCI

MICHAEL SCHEUER,

    Defendant.
_____/

**POSITION OF THE DEFENDANT WITH RESPECT TO SENTENCING FACTORS AND INCORPORATED SENTENCING MEMORANDUM**

COMES NOW, the Defendant, MICHAEL SCHEUER, pursuant to 18 U.S.C. § 3553(a), hereby files his Position with Respect to Sentencing Factors and Sentencing Memorandum which he respectfully requests this Honorable Court to exercise its discretion and impose a sentence below that suggested by the advisory Sentencing Guidelines.

There are substantive Sentencing Guidelines objections that are discussed herein. Other than the objections and corrections contained herein, Mr. Scheuer adopts the Presentence Report.

**INTRODUCTION**

As reflected in the Plea Agreement, Mr. Scheuer acknowledged that he freely and voluntarily entered into the plea agreement because he was in fact guilty. When considering all of the factors of the offenses, his acknowledgment of responsibility, and his remorsefulness, we respectfully request that this Court impose a combined total sentence of 30 months' imprisonment. Such a sentence is one that is "sufficient, but not greater

1

than necessary" to comply with the purposes of sentencing as required by 18 U.S.C. § 3553(a). See Kimbrough v. United States, 552, U.S. 85, 101 (2007). A sentence of 30 months' imprisonment will satisfy the statutory goals of sentencing and will constitute a sentence that reasonably provides just punishment, protects the public, promotes respect for the law, affords adequate deterrence and promotes rehabilitation as required by 18 U.S.C. § 3553(a)(2).

This memorandum:

(1) addresses the factors set out in 18 U.S.C. § 3553(a), which the Court must consider in determining the particular sentence to impose;

(2) incorporates character letters from family who praise the Defendant's good character and kindness;

(3) sets out the reasons why the facts of this specific case are unique; and

(4) explains why a sentence that includes the imprisonment suggested by the Sentencing Guidelines would be excessive.

I. **BOOKER** AND 18 U.S.C. § 3553(A)

The decision of the United States Supreme Court in *Booker* has rendered the United States Sentencing Guidelines "effectively advisory." *U.S. v. Booker*, 125 S. Ct. 738, 759-67 (2005). Pursuant to *Booker,* sentencing courts are required to consider a Defendant's guideline range, but may "tailor the sentence in light of other statutory concerns as well." *Id.* at 767 *(citing* 18 U.S.C. § 3553 (a)).

As a result of *Booker* federal district courts must consider the seven factors set forth by 18 U.S.C. § 3553 (a) in determining a sentence:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed -

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

    (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    [the applicable Sentencing Guidelines];

(5)    any pertinent [Sentencing Guidelines] policy statement;

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victim of the offense.

Moreover, § 3553(a) and the 'parsimony provision' mandate that the district court "impose a sentence sufficient but not greater than necessary," to comply with the purposes of sentencing set forth in § 3553(a)(2). Sufficiency of a sentence rather than excessiveness is echoed in 18 U.S.C. § 3582, which recognizes that "imprisonment is not an appropriate means of promoting correction and rehabilitation."

    II.    **APPLYING THE FACTORS CONTAINED IN 18 U.S.C. § 3553(a)**

        A.    **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

<u>**Circumstances of the Offense**</u>

Mr. Scheuer entered a plea to Count 1: Intentionally Causing Damage Without Authorization to a Protected Computer in violation of 18 U.S.C. § 1030(a)(5)(A) and Count

2: Aggravated Identity Theft in violation of 18 U.S.C. § 1028A. PSR ¶ 1-3. The facts surrounding the charges are accurately described in the PSR and reflect that, after being suspended and then terminated from his Disney employment without explanation, Mr. Scheuer altered Disney dining menus by unlawfully accessing the Menu Creator platform and engaged in a denial-of-service process that temporarily locked some employees out of their accounts.

The most concerning part of this offense is not necessarily the Aggravated Identity Theft that carries the mandatory minimum sentence, it is the menu alterations made by Mr. Scheuer. It is important to discuss what these alterations were and were not. Generally described, there were three categories of menu alterations: (1) price/quantity changes, (2) edits to wording not associated with allergens, and (3) allergen alterations.

The price changes were, arguably, the most difficult to identify by the Disney editors. These consisted of pricing changes impacting the costs by a few dollars (either up or down) and/or quantity changes (ie. the number of ounces on a steak changed from 8 ounces to 6 ounces). See Exhibit 1 (Price Alterations). Such edits were not facially obvious without the original menu or a deep understanding of the meals being offered.

The second category of edits pertained to wording changes and can best be described as juvenile or prank. See Exhibit 2 (Verbiage Alterations). For example:
- Main courses were left intact but the entire description was removed;
- QR code link was changed to be Israel related;
- "Cheesy Grits" was changed to "Cheesy Shits";
- "Golden tipped Asam" was changed to "Golden tipped Ass";
- "Infamous goose" was changed to "Infamous moose"; and
- "Shellfish" was changed to "Hellfish".

The third category changed allergen descriptions. See Exhibit 3 (Allergen

4

Alterations). Disney, true to its frictionless customer experience goals, does not state which menu items a customer <u>cannot</u> eat due to an allergy. Instead, an allergen menu lists items that you <u>can</u> eat for certain allergies. Consequently, removing an allergen item that is listed is not necessarily threatening. Mr. Scheuer removed certain allergens from menus. Adding allergen items to a meal could be more serious as a customer can believe it is safe to eat with the listed allergen. Mr. Scheuer added allergen items to meals but most were obvious, inconsistent, and hypocritical to the menu item itself. For example:

- "Milk" was added to a Stack Burger that listed "American Cheese" as an ingredient;
- "Fish/Shellfish" and "Peanut" were added to a Brownie A La Mode that listed an Allergy Friendly Brownie;
- "Milk" was added to Shrimp Tempura;
- "Milk" was added to a Chicken Sandwich;
- "Peanut" was added to a Pecan Pie Tart;
- "Milk" was added to Prime Rib;
- "Milk" was added to a Flat Iron steak; and
- "Milk" was added to Mojo-brined Pork.

These inconsistencies were the arguably the most obvious changes to notice. While serious, it is challenging to say that listing something such as a brownie a la mode as being safe for a shellfish allergy could cause risk of death or injury. The 'more concerning' 'allergens added such as a cheeseburger being safe for milk are obvious mischaracterizations. The editors caught each allergen alteration and no customers were ever at risk because the menus were never forward facing customers.

### <u>History and Characteristics of the Defendant</u>

Mr. Scheuer is 40 years of age. Mr. Scheuer is a zero-point offender as he has no prior criminal history. PSR ¶ 72. His background and life history are offered as background information in support of his request to vary and depart from the advisory guidelines herein.

Born in Cleveland, Ohio, Mr. Scheuer was the youngest of all his siblings. In school, he did not have many friends and was bullied for being quiet. He has always had low self-esteem and poor communication skills. He met his wife online, and she is the "only person he feels close to". She suffers from debilitating health problems making him the sole income earner in the family. Notably, his job at Disney provided them with their health insurance. Together, they have three minor children. See Exhibit 4 (Family Photos). But the face of depression, suicidal ideation, and anxiety can present itself as looking no different than "normal" people. Mr. Scheuer has a lengthy history of mental health issues dating back more than 15 years.

The offense conduct occurred just days after Mr. Scheuer returned from paternity leave. A newborn at home and with three children under the age of five, plus the stress of his wife's physical health conditions meant his employment was critical to his family's care and well-being. Shortly after returning to work, Mr. Scheuer voiced a difference of opinion to his supervisor about a new process of menu creation. He believed his team agreed with him, but his supervisor did not. He met with his supervisor and a disagreement occurred. Mr. Scheuer had a panic attack during the meeting. The next supervisor up the chain of command stated to Mr. Scheuer that he did not threaten his supervisor, but that Mr. Scheuer was going to be suspended.

Mr. Scheuer loved working for Disney and moved to Orlando to pursue employment with the company. With his world seemingly collapsing, he wanted to understand what happened. He emailed Human Resources 24 questions pertaining to the suspension and requesting accommodations for his mental health issues. Then, without explanation, he was terminated by Disney a few days later. This was devastating to him and it was also

confusing. Mr. Scheuer explained to Disney that he suffered from mental health problems and felt he was terminated because of his mental health condition and anxiety. Mr. Scheuer contacted his managers and Disney's mental health officer about resources for employees. He did not receive a response from Disney.

Mr. Scheuer's mental health problems began to dictate his decision-making. He was also angry. He also started drinking alcohol heavily leading to severe depression. With his poor communication skills, no friends, and no job, he reached out to employment attorneys about getting his job back. He could not get an attorney to take his case. He filed a complaint with the U.S. Equal Employment Opportunity Commission but did not get a quick response. He felt isolated and depressed. He did not understand why nobody would speak with him.

With a lengthy history of mental health issues dating back to 2010, he turned to what he thought would get Disney to respond to him. He started altering Disney's menus to try to get their attention and respond to him. A commonly known and shared password that was utilized by his team was his access to the system. He simply logged in as if he still worked for Disney. Then, when Disney did not respond, he escalated the alterations. He knew and understood the menu review process and knew the menu changes would be identified in Disney's extensive menu review process. He truly hoped Disney would know it was him making the changes since he was familiar with the menu process.

However, Disney did not respond and Mr. Scheuer's downward spiral continued. While he never intended to hurt anyone else, in September 2024, he was admitted for inpatient care due to suicidal ideation and depression. PSR ¶ 92. About the same time he was hospitalized, he became aware of the criminal investigation and retained a law firm.

7

However, during October 2024, the lawyer he hired went on a trip overseas and had limited contact with him. Yet again, he felt alone in this process and know the FBI was involved. Mr. Scheuer began receiving notifications of law enforcement examining his emails and they executed a search warrant at his residence. He started to email the FBI agent directly because his lawyer was overseas. Against his wife's advice, he took a trip to see his parents in Ohio and it was only more upsetting. While he was there, he drank to excess and he drank heavily during his flight back to Orlando. When he landed in Orlando, he deviated from the route to his home and went to his former co-worker's house where he was identified waving at their Ring camera. Mr. Scheuer was arrested shortly thereafter.

A subsequent forensic psychological evaluation is accurately summarized in the PSR and in Dr. Collins' report. PSR ¶ 93. With inpatient mental health treatment for nonviolent offenders with significant mood disorders, his prognosis is considered good within 1 year. He scored in the low range for psychopathy and in the low-risk range. He was recommended for in-patient care as soon as possible for a term of 90-days.

Mr. Scheuer never wants his mental health condition to adversely impact him, his family, or others again. He remains committed to improving his mental health via in-patient counseling and care. He is fortunate to have the resources and support to obtain a healthy lifestyle.

Unfortunately, Mr. Scheuer was not able to obtain appropriate mental health care prior to sentencing. This is, in part, due to the Government seeking detention based upon incorrect information that was presented to Magistrate Judge Irick. Specifically, the Government sought detention based on Mr. Scheuer's alleged conduct following the execution of the search warrant at his home. At the detention hearing, the Government

8

contended that a "ransom note" had been sent to one of the Disney co-worker's mother. A similar version of the ransom note had also been received by Mr. Scheuer. The ransom note is a common phishing scam perpetuated by those trying to extort people for money. At the detention hearing on November 5, 2024, the Government's position was that Mr. Scheuer emailed the ransom note. However, on January 27, 2025, after numerous Defense requests to follow up on that information, the Government informed the Defense that the FBI did not believe that Mr. Scheuer was the sender of the ransom note. On January 23, 2025, Mr. Scheuer entered his guilty plea which included a plea to the 18 U.S.C. §1028A count that carried a two-year mandatory minimum sentence. As a result of the Government's mistake, Mr. Scheuer suffered the prejudice of pretrial detention and was prevented from obtaining Dr. Collins' recommendation of inpatient care for a period of at least 90-days.

We do get a glimpse of Mr. Scheuer's mental state during the offense because he posted it to Reddit during that time. See Exhibit 5 (Reddit Post). In a post titled, "Reaching the end?", Mr. Scheuer referred to himself as an "outcast" with "no friends". He stated, "I was recently fired from my job for having a panic attack. The people involved with firing me treated me like a criminal. Me, who is afraid of everyone and just wants to blend into the background. I was blown away how absolutely nobody cared about me. Not one person from work reached out to check on me…I started seeing a psychiatrist and behavioral therapist but my firing made me realize it's all too late…I don't even blame people for treating me poorly, I deserved it…since I was fired I sit around fuming, planning revenge because I feel so wronged. But then I remember that maybe they are not the problem, maybe it is me. I've always been afraid of everybody, but its everybody that's been afraid

9

of me...It's my whole life, I've had it wrong." See Exhibit 5.

While incarcerated, despite not being able to go to in-patient care, Mr. Scheuer utilized the opportunity to better himself. He has read over 50 books and utilized the jail's ability to access the Khan Online Academy. He has taken online courses related to World History, U.S. History, Electrical Engineering, Economics/Finance, and Grammar. While this does not provide the therapy he needs, it demonstrates his commitment to self-improvement. With appropriate counseling, medication, and alcohol treatment, he poses no risk to reoffend. Mr. Scheuer understands that a period of incarceration is appropriate for his conduct and he wants to return to his family mentally stronger and healthier. Mr. Scheuer has the support of his family who value him and will help with his recovery. They have written letters of support detailing how out of character this conduct was for Mr. Scheuer. These letters overwhelmingly demonstrate the true content of Mr. Scheuer's character and dedication to his family. See Exhibit 6 (Character Letters). He understands that his conduct was alarming and caused concern. His remorse is sincere.

Prior to being terminated, Mr. Scheuer was a peaceful, dedicated employee who never had any legal issues. While Mr. Scheuer has been troubled by mental health issues, he never lashed out on them prior to this triggering event. He understands that the only way for him to regain control of his life is to stay sober and get intensive mental health treatment. Once released from custody, Mr. Scheuer plans on surrendering to an in-patient mental health care near his family. He has no intention of contacting his former co-workers again.

    a. *Criminal History*

Mr. Scheuer has a criminal history score of zero. PSR ¶ 72. A consideration for

this Court to consider is the length of time in which he refrained from the commission of any crime as it "is a factor that is critical to a court's determination of a sentence it should impose." *See United States* v. *Ward*, 814 F. Supp. 23 (E.D. Virginia 1993) (recognizing the validity of a downward departure below the sentencing guidelines per USSG § 5K2.0 because the sentencing guidelines fail to consider the length of the time encompassing a defendant's criminal history). He poses no risk to reoffend and, with counseling, will remain a productive member of society.

Mr. Scheuer, at the age of 40, has never been to prison or served even a limited jail sentence. He had no interaction with law enforcement prior to this arrest. This factor should be given some weight when considered, along with his substance abuse history and mental health conditions. A 30-month sentence is sufficient but not greater than necessary.

### b. Mr. Scheuer's age and lower risk of recidivism

In determining an appropriate sentence for Mr. Scheuer, the Court should take into consideration that he is 40 years old. With a 30-month sentence, he will be released from prison when he is nearly 43 years old. Generally, individuals over age of 40 show significantly lower recidivism rates when compared to much younger defendants.[1] Further, recidivism rates decline relatively consistently as age increases.[2]

In that this Honorable Court must consider deterrence and protection of the community, Mr. Scheuer's lower prospect of recidivism upon release, along with the parsimony principle, weighs in favor of a downward variance rather than the incarceration

---

[1] *See* "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines" at 12, (2004).
[2] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf

as contemplated by the advisory guidelines.

As detailed herein, Mr. Scheuer has utilized his current incarceration productively. He also routinely participates in Bible study and was relocated to the Christian dorm within the Orange County Jail. The ends do not justify the means, but it does separate Mr. Scheuer's conduct from the heartland of many of the defendants this Court has previously sentenced.

### B. The Need for the Sentence Imposed

Section 3553(a)(2) lists the four purposes of sentencing, which can be summarized as: just punishment, deterrence, protection of the public, and rehabilitation.

#### a. *Just Punishment*

A downward variance sentence for a 40-year-old man, with no prior convictions, would satisfy the goals of sentencing. The advisory guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom." *See United States* v. *Johnson,* 964 F.2d 124,125 (2nd Cir. 1992). A sentence that includes 30 months in prison followed by supervised release with counseling and treatment is sufficient and not greater than necessary.

#### b. *Deterrence*

Mr. Scheuer can be a productive and beneficial member of society. He demonstrated as much working as a dedicated employee and beloved father his entire life. However, this is especially true if refrains from alcohol abuse and applies himself to positive actions instead of using alcohol to mask his need for mental health treatment.

Mr. Scheuer was arrested on October 23, 2024 in this matter and has been detained since then. While in custody, Mr. Scheuer has had no disciplinary problems. He

largely keeps to himself. With restitution to be paid in full, two and a half years in prison is a substantial amount of time in prison.

### c. Protection of the Public

Any argument that Mr. Scheuer is a danger to the community is contradicted by the good that he has accomplished in his life and how out of character his criminal conduct was for him. In the instant case, the Defendant's conduct suggests that the public need not be protected from Mr. Scheuer. *See United States* v. *Thomas,* 595 F. Supp. 2d 949, 952 (E.D. Wis. 2009) (wherein a probationary sentence was imposed despite a guideline recommendation of imprisonment). With intensive mental health and alcohol treatment, Mr. Scheuer can remain a peaceful and loving father that his family needs.

Mr. Scheuer recognizes and accepts that he had a lapse of good judgement. He understands that a period of incarceration is appropriate. However, he also recognizes and accepts that he will not engage in the same conduct ever again. Mr. Scheuer acknowledges the significance of his mental health concerns and alcohol abuse as diseases that will follow him for the rest of his life.

### d. Rehabilitation

With regards to rehabilitation, 18 U.S.C. § 3582 rejects the notion that imprisonment is an appropriate means of promoting correction or rehabilitation:

> The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation,

In following this provision, the advisory sentence contained in Mr. Scheuer's PSR

would not promote rehabilitation. A downward variance sentence of 30-months of imprisonment coupled with community service, alcohol treatment, and counseling would be the more appropriate sentence for Mr. Scheuer.

### C. The Kinds of Sentences Available

Pursuant to *Booker*, this Honorable Court has significant discretion in fashioning a sentence that is "reasonable" based on § 3553(a), including incarceration and supervised release. In the instant case, a guidelines prison sentence would contravene 18 U.S.C. § 3553(a) and the 'Parsimony Provision' which proscribes the imposition of a sentence that is greater than necessary to achieve the statutory goals as set forth above.

### a. The Sentencing Guidelines and Guideline Policy Statements[3]

The PSR concludes that Mr. Scheuer base offense level is 6. PSR ¶ 54. Probation then scores loss, 10 or more victims, sophisticated means, risk of injury, position of trust, and statutory enhancements that increase the Guidelines by 26 levels. There is a three (3) level reduction for acceptance of responsibility and a 2-level reduction for Zero Point Offender, placing Mr. Scheuer at a total offense level of 27, in Criminal History Category I. Consequently, the corresponding Guidelines range for a level 27 is 70-87 months incarceration in the Bureau of Prisons. PSR ¶ 67, 110.

The scoring in this case is largely directed by the "loss amount". However, it is important to note that the out-of-pocket loss caused by the reprinting of menus was approximately $150,000. That loss amount would add 10 levels, not 14 levels, to the Guidelines calculations. Disney is being reimbursed for paying employees that were

---

[3] Pursuant to *Booker*, "District courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Booker*, 125 S. Ct. 759-67.

already on salary and re-directed to respond to Mr. Scheuer's conduct.

With regard to the number of victims, there are two victims who were financially harmed: Disney and Taylor Corporation (for printing). The additional victims accounted for in the enhancement arise from employees being locked out of their computers during the denial-of-service. Arguably, they suffered no harm but they are technically scorable. It is also accounted for in Count Two relating to the Aggravated Identity Theft. As the Court is aware, that count alone increases the sentence by an additional two years and not just 2-levels.

Regarding a sophisticated means enhancement, it is safe to say that the Sentencing Guidelines are antiquated when it comes to the use of technology. The items Probation claims are "sophisticated" such as a virtual private network (VPN) and/or virtual machine oftentimes come today pre-installed on tablets and phones or they are readily available to be downloaded from Fortune 50 companies such as Apple, Microsoft, and Oracle. As a result, the Guidelines add an additional 2-levels.

Additionally, the Guidelines suggest an additional 2-level enhancement for "reckless risk of death or serious bodily injury". As stated herein, this too exaggerates the seriousness of the conduct. The allergen alterations were obvious and were never viewed by a customer after an additional standard process review by Disney's chefs, restaurant managers, and editors.

The position of trust enhancement, according to Probation, is applied because of a "special skill" for utilizing the same software and computer skills that cause the sophisticated means enhancement. Probation also conflates that he obtained these special skills while working for Disney. This enhancement should not be applicable.

In all, there are, arguably, 12-levels of enhancements that are either inapplicable or overstate the seriousness of the offense. This 12-level increase results in a Total Offense Level of 27 with a range of 70-87 months plus 24 consecutive months for Count Two (94 months total). A 10-level reduction would result in a 24-30 month advisory range. The Defense recommends a total sentence at the high-end of that sentencing range: 30 months.

These calculations do not consider the timely entry of the plea to an Information, the discussions contained herein, and Mr. Scheuer's strong commitment to rehabilitation. Additionally, Mr. Scheuer proffered with two agents and provided information that alleviated any concerns he may have planted any viruses or malware within Disney's servers. This saved Disney time and alleviated any unnecessary concern about malware.

These mitigating factors are acknowledged, but given no weight, in Probation's recommendations to the Court. A sentence of 30-months of imprisonment provides for a meaningful downward variance in this cause would be reasonable and just. It captures the intrusiveness of the menu alterations, victim impact and the use of company email addresses to further the denial-of-service attack.

### b. Need to Avoid Unwarranted Sentence Disparities Among Defendants

There are no co-defendants.

### c. The Need to Provide Restitution to any Victim of the Offense

Mr. Scheuer is prepared to make full restitution to the victim corporations of the offense. While most of the personnel for Disney were already being paid a salary, Mr. Scheuer understands that many had respond to the cyber-intrusions. The "loss" amount is, primarily, costs related to their repurpose as they were owed their salaries by Disney.

16

There were also printing costs for menus that contained alterations even though the menus were never utilized in a Disney Park.

Regarding the Victim Impact Statement of "D.P.", there are several factual assertions that are false contained within it. First, undersigned counsel informed D.P.'s attorney that Mr. Scheuer did not contest the injunction being sought by D.P. D.P.'s attorney expressed that service had not been perfected which is why the injunction hearing has not been able to proceed. The judge in the proceeding is willing to issue the injunction, but, according to D.P.'s attorney, he will not proceed until service is perfected. Unfortunately, the injunction was signed for by a deputy within the jail and Mr. Scheuer has not received a copy. Furthermore, because the FBI erroneously attributed the ransom note/spam to Mr. Scheuer, D.P. still believes he sent it. He did not and the FBI agrees that he did not send it. Mr. Scheuer will apologize to D.P. and all his Disney colleagues during the sentencing hearing. He is deeply remorseful and will never contact them again. Part of why he agreed to proffer and plea quickly was to bring them as much restoration of peace as possible – including his willingness to stipulate to the injunction he has not yet received.

### III.    CONCLUSION

For the reasons stated herein, and those presented at the sentencing hearing, Mr. Scheuer respectfully requests that this Honorable Court exercise its discretion and impose a downward variance. Mr. Scheuer requests that he be given a sentence that is reasonable but not greater than necessary and accounts for the strong possibility that he can contribute to society in a positive way and restores him to his family and young daughters.

Respectfully Submitted,

/s/ *David Haas*
David Haas
Haas Law, PLLC
Attorney for the Defendant

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on April 16, 2025, I electronically filed the foregoing, with the Clerk of the Court, by using the CM/ECF system, which will send a Notice of Electronic Filing to the following: Assistant United States Attorney Robert Sowell.

/s/ *David Haas*
David Haas
Haas Law, PLLC
Attorney for the Defendant
201 S. Orange Avenue, Suite 1017
Orlando, Florida 32801
Telephone: (407) 755-7675
Email: David@HaasLawPLLC.com